UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GERALD DUCHENE, et al.,                          :
                                                 :          06 Civ. 4576 (PAC) (GWG)
                              Plaintiffs,         :
                                                 :
      -against-                                  :
                                                 :
                                                 :
MICHAEL CETTA, INC., d/b/a SPARKS               :
STEAK HOUSE, and MICHAEL CETTA,                 :          ECF CASE
                                                 :
                              Defendants.         :
-------------------------------------------------------------X

## DECLARATION OF LOUIS PECHMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, ATTORNEYS' FEES, AND SERVICE PAYMENTS

LOUIS PECHMAN, an attorney duly admitted to practice in the Southern District of New York, declares under penalty of perjury:

1.      I am a partner at Berke-Weiss & Pechman LLP ("BWP"), and Class Counsel in this matter. This declaration is made in support of Plaintiffs' Motion for Final Approval of Settlement, Attorneys' Fees, and Service Payments pursuant to Federal Rule of Civil Procedure Rule 23. I am personally familiar with the facts discussed herein and attach as exhibits hereto true and correct copies of the documents referenced within.

2.      I am the attorney primarily responsible for the prosecution of plaintiffs' claims on behalf of the Rule 23 Class against Michael Cetta, Inc. d/b/a Sparks Steak House ("Sparks"), and Michael Cetta (collectively, "defendants"). I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently to such facts.

## PROCEDURAL HISTORY

3.      Plaintiff Gerald Duchene commenced this action (the "Lawsuit") on June 14, 2006 as a class and collective action brought on behalf of all others similarly situated. A copy of the Complaint is attached hereto as Exhibit A.  As more and more waiters expressed interest in joining the Lawsuit, we conducted additional interviews and filed two amended complaints, on August 4, 2006 and February 5, 2007, which added these new plaintiffs to the caption.

4.      On August 24, 2006, the Court ordered the Lawsuit to proceed as a collective action (the "August 24, 2006 Order"), pursuant to Section 216(b) of the FLSA, on behalf of all waiters who were employed by Sparks at any time between June 14, 2003 and the date of final judgment in the proceeding.  A copy of the August 24, 2006 Order is attached hereto as Exhibit B.

5.      Pursuant to the August 24, 2006 Order, we sent out notice of the collective action to the individuals identified by defendants as having worked as waiters at Sparks since June 14, 2003.  The opt-in deadline for filing Consents to Sue with the Court was December 26, 2006.  A copy of the Notice of Lawsuit with Consent to Sue is attached hereto as Exhibit C.  Ultimately, sixty-three waiters joined this lawsuit as "opt-in" plaintiffs under the FLSA.

6.      On June 18, 2007, the Court granted plaintiffs' motion under Rule 23 to certify a class "consisting of all persons who have worked as waiters at Sparks between June 14, 2000 and the date of final judgment in this proceeding" (the "Rule 23 Class"). A copy of the June 18, 2007 Order is attached hereto as Exhibit D.

7.      On July 30, 2007, we applied to the Court to reopen the opt-in period to allow additional waiters who had expressed an interest the opportunity to assert their rights under the FLSA.  The Court declined to reopen the time period in which Sparks

2

waiters could opt-in to the lawsuit in a memo-endorsed letter. A copy of the July 30, 2007 letter endorsed by Judge Crotty on August 6, 2007 is attached hereto as Exhibit E.

8.      On September 21, 2007, class action notices approved by the Court were sent out to all individuals identified by defendants as having worked as waiters at Sparks since June 14, 2000. A copy of the Notice of Class Action is attached hereto as Exhibit F.

9.      Before and during the litigation of this action, BWP attorneys conducted a thorough investigation into the merits of the potential claims and defenses. We met with over fifty plaintiffs to investigate the background facts necessary to prove that many of the tip pool participants did not in fact perform any direct customer service. We focused our investigation and legal research on the underlying merits of class members' claims, the damages to which they were entitled, and the propriety of class certification. In particular, we focused on learning more about the duties of Sparks employees who should not have been included in the tip pool, such as the Banquet Manager, the Wine Steward, the Kitchen Manager, kitchen "waiters" and expediters, and the dessert "waiter."

10.     After the Lawsuit was filed, BWP continued to conduct extensive investigation and prosecution of this case, including, but not limited to, reviewing documents, deposing Sparks' owners and managers, defending plaintiffs at their depositions, reviewing defendants' and plaintiffs' deposition transcripts, reviewing and analyzing payroll data and tip sheets, filing two Amended Complaints, briefing plaintiffs' motion to certify the case as a collective action, briefing and presenting oral argument on plaintiffs' motion to certify the case as a class action, developing the factual and legal arguments in anticipation of potential summary judgment motions, and engaging in intense and detailed settlement negotiations with defendants. To date,

we have expended over 1823 hours in prosecuting this case, and will continue to invest many additional hours in bringing this matter to a satisfactory resolution.

11.     Sparks has subsequently modified its policies so that tips are now distributed only to tipped employees who provide direct customer service, and efforts were made to integrate kitchen waiters into the dining room and to discontinue other employees' participation in the tip pool. These actions effectively ended the accrual of potential liability under the FLSA and the NYLL as of December 2008.

## SETTLEMENT NEGOTIATIONS

12.     In fall of 2008, we retained, jointly with defendants, Mr. Norman Bromberg, former District Director of the U.S. Department of Labor's Wage and Hour Division, New York District Office, to provide an objective expert analysis of the claims. Taking into account Mr. Bromberg's assessment of the strengths and weaknesses of each of the claims in the Lawsuit, along with the discovery taken in earlier stages of this litigation, we agreed with defendants on a framework for resolving the case.  A copy of the Affidavit of Norman Bromberg is attached hereto as Exhibit G.

13.     After reaching a settlement in principle, the parties continued to discuss the details and various aspects of the settlement.  The parties participated in a settlement conference in this matter under the supervision of Magistrate Judge Gabriel Gorenstein at which further details of the settlement were agreed to.

## THE SETTLEMENT AGREEMENT

14.     On April 6, 2009 and April 8, 2009, the parties signed the Joint Stipulation of Settlement and Release (the "Settlement Agreement").  A copy of the Settlement Agreement is attached hereto as Exhibit H.

15.     The Settlement between the parties totals $3,150,000.  The NYLL damages distributed to the Rule 23 Class Members total $2,228,607.53, which amount has been

divided into Annual Supplemental Tip Pools based on the amount of tips which had been taken out of the tip pool for certain non-waitstaff employees of Sparks for each year of the statute of limitations period, dating back to June 14, 2000.  The defendants have disgorged the full value of tips taken from the tip pool for those employees against whom plaintiffs have stronger claims, and half the value of tips taken for the wine steward and the banquet manager, who each performed a combination of managerial and service roles, and against whom plaintiffs may have weaker claims.  Each Annual Supplemental Tip Pool will be allocated proportionally to members of the Rule 23 Class based upon a formula that divides the pool by the total hours worked by the Rule 23 Class for that year, then multiplied by the number of hours worked by each Class Member during that year.

16.     The FLSA damages distributed to the opt-in plaintiffs will total $921,391.92.  Each FLSA opt-in plaintiff shall receive the tip credit that was taken by Sparks for the period for which they are covered under the FLSA statute of limitations, plus liquidated (double) damages.[1]  This represents full recovery under the FLSA.

17.     This settlement compares favorably to other recent settlements in wage and hour cases brought against comparable New York City restaurants.  Here, the average individual settlement award is approximately $15,671 (less attorneys' fees).  Even after taking into account the proposed attorneys' fees, there are more than forty Rule 23 Class Members who will net settlement amounts greater than $20,000.

---

[1] Specifically, for purposes of this settlement, the statutory tip credit to be applied to the FLSA damage calculation shall be a tip credit of $1.85 per hour between June 21, 2001 and December 31, 2004; $1.30 per hour between January 1, 2005 and December 31, 2005; $0.80 per hour between January 1, 2006 and December 31, 2006; $0.55 per hour between January 1, 2007 and July 24, 2007; $1.25 between July 24, 2007 and July 24, 2008; and $1.95 between July 24, 2008 and December 31, 2008.

5

## PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL

18.     On May 26, 2009, plaintiffs filed their Motion for Preliminary Approval of Settlement in which they requested, among other things, that the Court grant preliminary approval of the Settlement Agreement and approve mailing of the Notice.

19.     On July 8, 2009, the parties attended an Interim Pretrial Conference before the Court, at which time the Court granted plaintiffs' Motion for Preliminary Approval of Settlement.  Attached hereto as Exhibit I is a true and correct copy of the Preliminary Approval Order dated July 8, 2009.

**Notice and Class Member Response**

20.     Pursuant to this Court's July 8, 2009 Order, on July 9, 2009 we mailed the Notice of Proposed Settlement of Class Action Lawsuit and Fairness Hearing ("Notice") to all 201 Rule 23 Class Members to addresses initially provided by defendants and updated by BWP over the course of this litigation.  Attached hereto as Exhibit J is a true and correct copy of the Notice.

21.     The Notice advised Rule 23 Class Members, among other things, that they could file an Objection to the Settlement if they wished to do so.

22.     Of the 201 Notices which we mailed to the Rule 23 Class Members, twenty-nine Notices were returned as undeliverable.  Where forwarding addresses were available or the Rule 23 Class Member contacted us, we re-mailed Notices to the addresses provided.  Where no forwarding address was provided, we ran a skip-trace on the Rule 23 Class Members' social security numbers.  We re-mailed Notices to those Rule 23 Class Members who we were able to locate through these skip traces.  In all, we re-mailed approximately 22 Notices.  We have not been able to find current addresses for seven Class Members (whose combined shares of the Settlement total approximately $7,300), but will continue our efforts to locate these seven individuals.

6

23.     I have spoken to roughly seventy-five Rule 23 Class Members, most of whom came to my office to review the methodology by which we calculated the Settlement and to check the accuracy of the calculation of their individual awards. Over the course of meeting with Rule 23 Class Members throughout the objection period, a few errors in the calculation of hours for certain Class Members were discovered and resolved with counsel for defendants.

**The Objections**

24.     Six objections to the Settlement were filed, three of which (filed by Ante Ivce, Salko Celija, and Eugene Bonateau) have subsequently been withdrawn.  Every individual who filed an objection had been named in the Complaint as someone who was improperly in the tip pool and thus formed the basis for plaintiffs' requested recovery.

25.     We have confirmed with the former General Manager of Sparks, as well as many of the Class Members, all of whom universally agree that the primary duties of the three remaining Objectors, Mohamed Elbeyali, Jeton ("Jay") Karahoda, and Fatlum ("Lucky") Spahija, involved food preparation, not customer service, and that they were therefore not entitled to share in the waiters' tips.  Attached hereto as Exhibit K is the Affidavit of Rami Maher.  Attached hereto as Exhibit L is the Affidavit of Carlos Ponce.

26.     Of the three remaining objections, two are made by individuals, Elbeyali and Karahoda, who were excluded from the Rule 23 Class because from June 14, 2000 until December 31, 2008 their duties consisted primarily of food preparation in the kitchens.  According to the members of the Class, Elbeyali was in charge of plating and garnishing the hot appetizers, such as baked clams or lump crabmeat and scallops, for the runners to take to the customers.  Elbeyali worked at an appetizer station in the kitchen well away from the door to the dining room.  Karahoda's duties consisted of

preparing the hundreds of salads which are ordered each day at Sparks.  Like Elbeyali,
Karahoda worked at a station in the kitchen which was far away from any customers.
Elbeyali and Karahoda were expediters, not "waiters" who would be considered
"tipped employees" under the law, and had little to no interaction with customers.

     27.    The third Objector, Fatlum "Lucky" Spahija, is part of the Rule 23 Class
from 2000 through 2003.  The remainder of the time he has been excluded because, from
2004 through 2008, Spahija's primary duties, according to the Class Members, involved
ordering and preparing desserts and managing the dessert station next to the kitchen.
From 2004 through 2008, Spahija received a weekly salary from Sparks of
approximately $250 (in addition to tips and hourly wages) as compensation for this role.
Notably, Sparks' payroll records reflect that during the period from which he is
excluded from the Settlement, Spahija received from Sparks additional salary payments
of $9,475 in 2004, $13,500 in 2005, $11,750 in 2006, $12,000 in 2007, and $13,250 in 2008,
in addition to his cut from the tip pool for his role in managing the dessert station at
Sparks.

     28.    Although he states, "I strongly believe that I have worked more hours
than I was awarded," under the Settlement, for the period from 2000 through 2003
Spahija is receiving a full cut of the Settlement fund, preliminarily calculated as follows:

| YEAR | HOURS | AWARD |
|---|---|---|
| 2000 | 423.13 | $583.91 |
| 2001 | 2234.0 | $3,127.60 |
| 2002 | 2078.75 | $3,097.34 |
| 2003 | 1774.5 | $2,644.01 |
| TOTAL: | 6510.38 | $9,452.86 |

8

29.     BWP has received more than one hundred calls and met with dozens of Rule 23 Class Members who have reacted positively to the Settlement. A significant number of Rule 23 Class Members have spoken to me about the financial difficulties they have been having as a result of the current economy and have expressed how meaningful the Settlement, and their individual award, is to them. I have been told, in some cases, that the individual settlement awards may help Rule 23 Class Members stay out of foreclosure on their homes or enable them to make tuition payments for themselves or their children. Many of the Rule 23 Class Members were surprised at how large the Settlement was, having believed that there would not be more than a few hundred dollars available for each person. In fact, some Rule 23 Class Members who had never even called my office during the three years this case has been pending found out that they would be receiving more than $20,000 from the Settlement.

## ATTORNEYS' FEES

30.     BWP was founded by Laurie Berke-Weiss and myself in 1996. We have focused our practice on labor and employment law.

31.     During the last three years, BWP has litigated eight class/collective actions on behalf of individuals employed in the New York food service industry, in addition to a significant number of individual actions. *See, e.g., Atroce v. MARC of New York, LLC*, 08 Civ. 10396 (VM) (S.D.N.Y. July 22, 2009) (order preliminarily approving class action settlement); *Dumitrescu v. Mr. Chow Enters., Ltd.*, No. 07 Civ. 3601 (PKL), 2008 U.S. Dist. LEXIS 49881 (S.D.N.Y. June 30, 2008) (authorizing case to proceed as FLSA collective action of restaurant workers); *Khalil v. The Original Homestead Restaurant, Inc.*, No. 07 Civ. 695 (RJH), 2007 U.S. Dist. LEXIS 70372 (S.D.N.Y. Aug. 9, 2007) (conditionally certifying FLSA collective action of restaurant workers); *Freund v. Herbert Street LLC d/b/a Bobby Van's Steakhouse*, No. 09 Civ. 6940 (SHS) (KNF) (S.D.N.Y.

filed Aug. 6, 2009) (collective action against restaurant); *Huerta v. Scalinatella, Inc.*, No. 09 Civ. 6139 (LTS) (THK) (S.D.N.Y. filed July 8, 2009) (collective action against restaurant); *Haxhillari v. M.L.V. Restaurant LLC d/b/a Ben & Jack's Steakhouse*, No. 08 Civ. 10607 (RMB) (S.D.N.Y. filed Dec. 8, 2008) (collective action against restaurant); *In re Milos Litigation*, No. 08 Civ. 6666 (LBS) (S.D.N.Y. filed Aug. 5, 2008) (dual class/collective action against restaurant).

32.     Based on our extensive experience in NYLL and FLSA litigation and our thorough familiarity with the factual and legal issues in this case, we have reached the firm conclusion that the proposed Settlement is clearly in the best interests of the plaintiffs and the Rule 23 class.

**BWP Partners**

33.     I am a 1979 graduate of the School of Industrial and Labor Relations at Cornell University. I received my J.D. degree from Fordham University School of Law in 1983. I have worked as a Field Examiner at the National Labor Relations Board. Upon graduation from Fordham Law, I specialized in labor and employment law at Skadden, Arps, Slate, Meagher & Flom LLP, Vladeck, Waldman, Elias & Engelhard, P.C., and Lambos & Giardino. I also worked as an in-house labor counsel at the Daily News. I have been active in the labor and employment committees in various bar associations, and since 1996 have moderated a program at the New York County Lawyers' Association on "Handling Employment Discrimination Cases."

34.     Laurie Berke-Weiss graduated from the School of Industrial and Labor Relations at Cornell University, and received her J.D. from Fordham University School of Law. Ms. Berke-Weiss has worked as a New York City Assistant Corporation Counsel, a litigator at two Manhattan law firms and, for five years prior to the formation of BWP, as a solo practitioner. Ms. Berke-Weiss is a past president of the

New York Women's Bar Association, director of the New York Women's Bar

Association Foundation, Inc., a Vice President of the Fordham Law Alumni Association,

and a past Chair of the Audit Committee of the New York City Bar Association.

**BWP Associates**

35.     BWP associates performed such tasks as researching legal issues,

reviewing documents, drafting pleadings, motions, legal memoranda, and letters,

conducting interviews and consults with plaintiffs and Rule 23 Class Members,

attending depositions, meeting with defendants' counsel, attending court conferences,

and calculating settlement distributions which conform to the allocation formula set

forth in the Settlement.

36.     The following associates performed tasks for the Lawsuit:

- Jaime Duguay received her J.D. degree, *cum laude*, from New York Law School in 2006. Ms. Duguay worked at BWP as an associate attorney from November 2006 until June 2008.

- Jenifer Fusco received her J.D. degree in June 2005 from St. John's University School of Law, where she was president of the Labor Relations and Employment Law Society. Ms. Fusco worked at BWP as an associate attorney from March 2007 to January 2009.

- Amy McCann received her J.D. degree from Pace University Law School in June 2006, where she was Editor of the Law Review. Ms. McCann worked at BWP as an associate attorney from January 2009 to June 2009.

- Martine J. Price received her J.D. degree from Brooklyn Law School in June 2003. She worked at BWP as an associate attorney from December 2005 to September 2006.

- Kate Tagert received her J.D. degree *cum laude* from New York Law School in 2007. She worked at BWP as an associate attorney from August 2007 until February 2008.

- Jessica Tischler received her J.D. degree from Benjamin N. Cardozo School of Law in June 2007, where she was an executive board member of the Cardozo Moot Court Honor Society. She has worked at BWP as an associate attorney since January 2008.

- Erika Winkler received her J.D. degree from Fordham Law School in 2006. She worked at BWP in October 2006.

**BWP's Billing Practices**

37.   According to BWP's policy, a partner must be in charge of all litigations in which the firm is involved. Despite this, BWP makes every effort to assign work to junior associates to avoid inflating fees. Whenever possible, ministerial tasks are assigned to paralegals and interns.

38.   All attorneys and interns at BWP are instructed to maintain contemporaneous time records reflecting the time spent on this and other matters. Time is kept in one of two ways at BWP. It is either typed into a computer program directly by the timekeeper, or the timekeeper maintains a handwritten log of the daily time, which is then typed into the computer time keeping program by a staff assistant. In both situations, the timekeeper indicates the date and amount of time spent on a task to one-tenth of an hour, describes the work that was performed during the specified time period, and identifies the case to which the time should be charged.

39.   Through August 31, 2009, BWP has spent more than 1,823 hours over three years and three months litigating and settling this case, which includes more than 1538 attorney hours and 285 paralegal and intern hours. Many plaintiffs even had my cell phone number for after-hours access to accommodate their schedules and keep them informed. We anticipate expending many more hours after the date of this motion in appearing at the Fairness Hearing and administering the Settlement, which we expect will require a substantial commitment of time. For example, many of the Rule 23 Class Members who have received notice have had questions regarding the settlement. In fact, since the Notice was sent out to the Rule 23 Class Members, BWP

has expended dozens of hours responding to questions about the case and will continue to do so as the settlement administration continues.

40.    The hours reported are reasonable for a case of this complexity and magnitude and were compiled from contemporaneous time records maintained by each attorney and paralegal participating in the case.

41.    Below is a chart summarizing the specific attorneys, their hourly rates, and their total time worked on this matter, in addition to the total paralegal time spent on this matter. These are the rates which BWP charges to its non-contingency clients for hourly work performed by these individuals.

| Attorney | Rate | Total Time | Total |
|---|---|---|---|
| Louis Pechman | $400 until 12/31/2007; $500 after 1/1/2008 | 646.1 | $323,050.00 |
| Laurie Berke-Weiss | $400 until 12/31/2007; $500 after 1/1/2008 | 15.3 | $7,650.00 |
| Jaime Duguay | $150 | 307.4 | $46,110.00 |
| Jenifer Fusco | $150 | 12.6 | $1,890.00 |
| Amy McCann | $200 | 36.5 | $7,300.00 |
| Martine Price | $150 | 125.3 | $18,795.00 |
| Kate Tagert | $150 | 33.6 | $5,040.00 |
| Jessica Tischler | $150 until 12/31/2008 (as Jessica Neff) $200 after 1/1/2009 | 346.0 | $67,915.00 |
| Erika Winkler | $150 | 15.4 | $2,310.00 |
| Paralegal/Intern Time | $75.00 | 285.15 | $21,386.25 |
| Total: | | 1,823.35 | $470,341.25 |

42.    BWP also fronted out-of-pocket costs that were incidental and necessary to the representation of the Rule 23 Class, and including costs for court reporters, expert fees, telephone charges, postage, and photocopies. However, BWP is not seeking separate reimbursement for costs.

43.     BWP's request for 33 1/3% of the Settlement Fund less $35,000 is approximately 2.2 times the lodestar, far less than what Courts have awarded in similar cases.

44.     BWP undertook to prosecute this action without an assurance of payment for their services, litigating this case on a wholly contingent basis in the face of tremendous risk. Large-scale wage and hour cases of this type are, by their very nature, complicated and time-consuming. Attorneys undertaking representation of large numbers of affected employees in wage and hour actions inevitably must be prepared to make a tremendous investment of time, energy, and resources. Due also to the contingent nature of the customary fee arrangement, attorneys are asked to be prepared to make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind. Indeed, the facts and circumstances of this case presented numerous and substantial hurdles to a successful recovery of unpaid wages. BWP stood to gain nothing in the event the case was unsuccessful.

45.     To date, BWP has worked without compensation of any kind, and the fee has been wholly contingent upon the result achieved.

46.     BWP also had to consider the possibility that defendants could enter into bankruptcy at some point during the course of litigation. Defendants, like most restaurants in New York, are under financial stress, especially in the wake of the current financial crisis. Likewise, Rule 23 Class Members still employed by defendants have reported a noticeable decrease in business and, correspondingly, in their income. Given the effect of the current financial crisis on the restaurant industry in New York, defendants' financial stability is even more in doubt.

47.     No Class Member has raised objections to BWP's attorneys' fees as set forth in the Notice of Settlement.

## SERVICE PAYMENTS

48.     Two of the named plaintiffs, Gerald Duchene and Ibrahim Wakim, have dedicated many hours of their time to ensuring the success of this case, by communicating with other potential plaintiffs and Rule 23 Class Members, assisting in fact-gathering, and reviewing court filings for completeness and factual accuracy. Duchene and Wakim also attended depositions of defendants' representatives, and they themselves were deposed by defendants.

49.     I have exchanged hundreds of telephone calls and emails with Duchene, who often served as an intermediary with Sparks waiters who had questions about the Lawsuit. He reviewed pleadings and affidavits and other court submissions for accuracy and feedback from the perspective of the Class. Moreover, because of the publicity garnered by this lawsuit, Duchene – who was unemployed at the time it was filed – faced difficulty in finding restaurant employment. Indeed, it took Duchene months to find a job after the filing of the Lawsuit.

50.     Ibrahim Wakim, who was working as a waiter at Sparks through the course of this litigation, also stayed in regular contact with me and jeopardized his employment with Sparks in order to keep me informed and help prosecute the Lawsuit. He was an indispensable source as to what was happening *vis-à-vis* the case within the restaurant.

51.     In sum, Duchene and Wakim played a crucial role in ensuring that I was kept apprised of events occurring at Sparks with regard to the claims in the Lawsuit and helping to formulate case strategy. In recognition of the efforts of Duchene and Wakim, we ask this Court to approve service payments in the amounts of $25,000 for Duchene and $10,000 for Wakim.

52.    No Class Member has raised objections to the Service Payments to Gerald Duchene and Ibrahim Wakim, as set forth in the Notice of Settlement.

53.    Attached hereto as Exhibit M is a Proposed Order granting plaintiffs' Motion for Final Approval of the Settlement, Attorneys' Fees, and Service Payments.

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated:   New York, New York
       September 2, 2009

Louis Peckman (LP-6395)